Good morning, Your Honors, and may it please the Court. My name is Joshua Morrison, and I represent the appellant Eugene Whitlock. At issue in this case is whether Mr. Whitlock is entitled to qualified immunity for his conduct in initiating a due process disciplinary hearing in connection with Ms. Grigorescu in 2015 and engaging in various acts incidental to that due process hearing. In Crawford L., the Court recognized that the immunity standard in Harlow eliminates all motive-based claims in which the official's conduct did not violate clearly established law. And so in considering the contours of what constitutes a clearly established right for purposes of qualified immunity, the Court in Riley, which is going to be the focus of our argument, held that the right to be free from First Amendment retaliation, which is the right at issue here, cannot be framed as the general right to be free from retaliation for one's speech. So there's not a general standard. Instead, it's very specific. And this is based on the Supreme Court's holding in Saussure, where the Court held that the determination as to whether a right was clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. And so in Riley, which was a case involving a school district, a case involving First Amendment rights, the Court framed the issue as to what was the clearly established right very specifically. And in Riley, the Court said, you know, the issue was essentially whether in September of 2018, it was clearly established that a school district could not cease patronizing a company, providing historical reenactments and other events for students, because the company's principal shareholder had posted controversial tweets that led to parental complaints. That's a very specific statement. It's much, it's much beyond the general idea that you have rights under the First Amendment to speak, and those rights shouldn't be infringed. And it's on this specific point highlighted in Riley, this focus on specificity, that we think the trial court erred. The trial court here framed the issue in very general terms. Trial court said, defendant cannot properly argue that retaliation against protective expression is not barred by clearly established law, and then moved on. And so the key issue becomes, how do we frame the issue as to what right was clearly established in the present case? And to reach that point, I think it's important to focus on what Mr. Whitlock is alleged to have done. He became the Vice Chancellor of Human Resources shortly before the events that are being litigated, and in the course of that, performing his duties, he received an employment application from Ms. Grigorescu. At the time, Ms. Grigorescu was a classified employee of the district. She also occasionally served as an adjunct at-will faculty member, and she was applying for a tenure-track faculty position. Her application for the tenure-track faculty position represented that she held a master's degree. If I can interrupt, just to see if we're framing the issue correctly, for purposes of this stage here, we're assuming that her First Amendment activity was a substantial or motivating factor for the investigation, but I guess what you're disputing is whether it was clearly established that investigating her for potential misrepresentation is an adverse action. Is that the proper way to look at it? Well, I would say we're not, at this point, I think we have to assume, for purposes of this argument, that she engaged in free speech, and we're not really contesting that element. What we are focused on is whether there's clearly established law. So yes, whether his actions were adverse, but also if they were adverse, whether that adversity was something that violated clearly established law, such that a reasonable official would have known that he couldn't take those steps. And so when Mr. Whitlock received the employment application from Ms. Grigorescu, it represented that she held a master's degree. Now, this is a community college that we're dealing with. They employ faculty. Degrees in higher education are important, and under California law, in order to serve as a physics instructor, which was the position Ms. Grigorescu was applying for, you are required to hold a master's degree or the equivalent, and there's a process for that. You either hold a master's degree, or if you believe you've got the equivalent of that, you can apply for equivalency. There's a committee process. That wasn't followed. That didn't happen here. And so Mr. Whitlock has this application. It says that Ms. Grigorescu holds a master's degree, but in her personnel file is a letter from 2004 that she had previously filed with the college. It was obtained by an outside agency selected by Ms. Grigorescu. The outside agency reviewed her degree, which was a foreign degree, and they said this foreign degree, the same one that she was representing as a master's in 2015, was in fact the equivalent of a bachelor's degree. And so now Mr. Whitlock has a representation that she holds a master's degree, but a prior representation from an agency selected by Ms. Grigorescu that indicates that that very same degree is the equivalent of a bachelor's degree, and so there's a discrepancy there. And so Mr. Whitlock tries to figure out, okay, how do we figure out, you know, how to resolve this discrepancy? Ms. Grigorescu said, hey, I've worked for other colleges. I've worked for the University of California, Berkeley. I've worked for other places. They recognize my degree as a master's, and so Mr. Whitlock contacted them. That is now his act of contacting them to follow up on this allegation is now presented as the reverse. He also had conversations with Ms. Grigorescu's representative at certain points and eventually decided, hey, we've got a discrepancy here. I don't think she's being honest in representing that this degree is a master's, considering the outside agency that she selected, that she contracted with, views this as a bachelor's. And so at that point, Mr. Whitlock initiated a very extensive due process hearing process, and there's quite a few steps in it. And our contention is going to be that his act of taking what is a clear discrepancy in her representation on a key point relating to her qualification for employment was something that needed to be addressed and could be addressed and should be addressed as a disciplinary matter. And so that's what Mr. Whitlock initiated, and that's the main adverse action that Ms. Grigorescu points to. So initially, Mr. Whitlock provided a Scali hearing under California law, Scali v. State Personnel Board, and as a practice, essentially what- Mr. Morrison, I'm confused by your argument. Pardon me. It's probably my fault, not yours. But it turns out that the degree was a master's degree. What wasn't correct was the high school degree being a bachelor's degree. That was not an issue. And the issue here is if the motivation of Mr. Whitlock was not the later discovered non-error, but really because he didn't like Grigorescu taking up the green position on the garden rather than the parking lot- Well, in fact, he was the attorney. Isn't that the motivation that we're dealing with regarding Killey-established law? If she has a First Amendment right to protest the green, the parking lot versus the green area, is that, is there no Killey-established law that that is indeed a violation of her First Amendment rights? Is that your position? I would say three things to that, Your Honor. First of all, motive is under Crawford L. and Harlow. Motive, Mr. Whitlock's motive is not relevant. Secondly- Why is it not relevant? Because Crawford L. says Harlow eliminates motive-based claims in which the conduct did not violate clearly-established law. And so the question becomes, was there a violation of clearly-established law? And that's an objective question, not a motive-based subjective question. The right to public employee speech, clearly-established law, it's been First Amendment doctrine for forever. Yes, but the question is- And her speech was, she was active in this opposition to the school districts turning the gardens into public parking or paving over the gardens. And to the point where she sued, she was among the people who sued the district. And Mr. Whitlock himself was actually one of the attorneys for San Mateo County who defended the lawsuit. Not correct, Your Honor. Oh, really? She was not a plaintiff. Her name appears nowhere on the record of the case. But she was part of the group that did that. She alleges she was part of the group that was involved, but there's no record that that information came to Mr. Whitlock's attention. Also- Something that could be inferred. I mean, we're at a we're taking the facts in the light most favorable to the plaintiff here, right? Right. But there's no allegation that Mr. Whitlock, I guess there's an allegation that he should have known that she was somehow involved, but she was not- But we have to assume for this stage that the First Amendment activity was a substantial or motivating factor for investigating, right? Understood. But I did want to note she was not a plaintiff, and Mr. Whitlock is not a CEQA attorney. He was involved and then handed off the case or essentially got a firm that deals with CEQA litigation, and they handled the case. His name remained on the pleadings, but he wasn't the lead attorney. He wasn't this wasn't a case that he was- Well, I could see this proceeding, and you could put on evidence that there's no way that Mr. Whitlock would have even known of her involvement, and therefore his investigation and the campaign of harassment was not motivated by her First Amendment activity. But at this point, I don't think we could say that because we don't know. Our argument, again, though, is not based on sort of disputing the factual elements of her First Amendment conduct or his knowledge. Our argument is that in Crawford, Ellis, and in Harlow, the issue is not his motive. The issue is whether his conduct violated currently established law. That's the second prong. And that is an objective question. And- Assume, again, assume, we have to assume here for this, at this stage, that her First Amendment activity was a substantial and motivating factor for investigating her. Assume here that Mr. Whitlock was the one who investigated, and then he's the one who unilaterally fired her. Would that be clearly established that he couldn't do that? I think that's a different question, and that's, I think, if I may, that's not what he did. He didn't take any preemptive action. He didn't suspend her without pay. Yeah, but if he-  If she were the one. So I guess your argument is that it's not clearly established because he investigated, but it was someone else. It was a neutral arbitrator who made the ultimate decision. Is that- Yes. Our argument, essentially, is that he didn't take action against her. He referred the matter, which was illegitimate on its face, misrepresentation by her, to a due process hearing. And the decision was then essentially a recommendation from the hearing officer following a full due process hearing to the district's board. The board then took action. And the decision in the hearing, which was partially in- against Ms. Grigorescu and partially in her favor, reflects that it was a fair hearing. To the prior point that was- prior question was raised a few minutes ago, the information that Mr. Whitlock had at the time he initiated the hearing was simply those two pieces, the 2004 letter that said she doesn't have a master's, the later representation that she did. But I will note, it's possible for somebody to get a foreign degree that may, in fact, even be called a master's degree, and they can represent that they have a master's degree and not be dishonest. But that degree still may not be the equivalent of a U.S. master's degree for purposes of satisfying qualifications to teach. And so the issue here was one of dishonesty. It was one of misrepresentation. And, again, that issue, based on the 2004 letter, based on her employment application, showed two different representations at two different points in time by the same person about the same degree. And that was a legitimate issue that Mr. Whitlock was bound to pursue, and he did. But the act of referring this to a due process hearing, and she had extensive amounts of due process. She had a scaling hearing. She had a full evidentiary hearing in front of a neutral hearing officer. You know, to me, this entire argument is you're avoiding what the key issue is. Yes, all that could be true, and it could also be true that a substantial motivating factor in his even conducting the investigation and going through all these harassment allegations was her participation in the Green Movement, as you're calling it. I mean, both could be true, and you're just arguing one side of it. Mr. Whitlock was bound to process her employment application, and when he saw a legitimate issue that questioned the credential that indicated she was misrepresenting, do we want to have public officials in his position say, no, I'm not going to handle this. I don't want to cause trouble for myself. I'm going to let somebody slide. I'm going to let them misrepresent because I don't want to be dragged into court. There needs to be an objective standard. And here, all that he did was refer the matter to a scaling hearing where another administrator said, boy, this looks like something that should proceed to hearing, and then it went to a due process hearing where a neutral hearing officer came in and decided the case. He didn't dictate the result. He initiated the process, but it was a fair process. And, you know, we think that there's no currently established law that initiating a fair due process hearing where she's got full representational rights is somehow a violation of her constitutional right to free speech. Okay. Thank you, counsel. You're well over your time. Mr. Morrison, is your point that actually Mr. Whitlock didn't commence this action? It was Grigorescu's application that commenced the action? Well, Mr. Whitlock didn't seek this out. He saw the application. He then saw the 2004 letter and realized there was a clear discrepancy. And so faced with two different representations from Ms. Grigorescu as to what her agreement was, he then initiated a due process hearing that would get — would determine whether she was being honest, whether there was grounds for this. So your position is that there's no evidence at all that his motivation against her green position was a motivating factor in starting the investigation? We don't believe that to be the case, but we're not arguing that he was — Or is your position that irrespective of whether he really didn't like Ms. Grigorescu because she took the positions regarding the parking lot, he had an obligation to start the disciplinary hearing because of the discrepancy? Our argument is that a reasonable official in his position would have taken this discrepancy up and dealt with it in the manner that he did. Regardless of his motivation on the green factors. Correct. And the decision from the hearing officer, which, again, brought in new evidence, found that there wasn't dishonest. We'd also found other misrepresentations. That was a fair decision. This was a fair process. What Mr. Whitlock did is initiate a fair process. We don't think that act of initiating a fair process is somehow — somehow violates clearly established law. There's at least no law that anybody's pointing to that says initiating a fair due process hearing in this context is constitutionally problematic. All right. You're well over your time. All right. Thank you very much, Your Honor. Good morning, Your Honors, and may it please the Court. My name is Cabral Bonner with the law offices of Bonner & Bonner, and I represent the appellee, Violetta Grigorescu. Appellant Mr. Whitlock is asking this Court to reverse the district court's order denying qualified immunity for, as was just stated, initiating a disciplinary procedure that was going to lead to the termination of Ms. Grigorescu's employment. Specifically, he argues that there was no law at the time, clearly established law, that would have put him on notice that initiating this type of disciplinary action would be the type of adverse action that would be prohibited by First Amendment in the First Amendment employer retaliation context. As was stated here, stated in their brief, essentially what their case boils down to is that Mr. Whitlock acted in good faith, that he reasonably believed what he was doing was true. I don't think that's the position. I think the position is regardless whether he acted in good faith, maybe he had a grudge against Ms. Grigorescu, but when he was given the application and he saw a discrepancy, he proceeded to have a hearing and that that was objectively reasonable, and therefore there's no clearly established law that made that a violation of her First Amendment rights. Well, that would require that you determine his motivation was to be objectively reasonable. His motivation may have been, aha, I found a way to get rid of Ms. Grigorescu, there's a discrepancy here, and I'm going to use this to terminate her. That is the potential other way to look at it, and that's why this is actually, as they framed their appeal, is not a proper appeal for interlocutory appeal because it's not purely a legal question, as they framed it. They framed it in this way that all of the steps that Mr. Whitlock took were reasonable steps because he believed that there was a discrepancy, and since he was taking these reasonable steps, he's entitled to qualified immunity.  As long as there was a reasonable, objective way to start the disciplinary hearing, the fact that he had a motivation against her for her green activities is irrelevant. But the — looking at the case law on qualified immunity, there are two distinct questions. One is whether there is a constitutional violation, and the second is whether the right at issue was clearly established. Now, where does his motivation play or not play in that? What is objectively reasonable? The question is whether or not, looking at the case law, it would have been objectively reasonable to know that initiating a disciplinary procedure in response to someone engaged in protected activity would violate their First Amendment rights. And that, we can go back to Pickering. The Pickering case establishes that a public teacher has the right to engage in speech, even if that speech is counter to the speech of their employer, and that is protected. What they're essentially arguing is that it goes to the causation element of the constitutional violation question. The causation element is where you would look to see whether or not what he did was what the motivation was or wasn't. But that, in a First Amendment context, requires looking at what was a substantial motivating factor. Even if it might have been objectively reasonable to take these steps, if his motivation was to retaliate against her, then that's still an improper motivation. Because First Amendment, the courts treat First Amendment employer retaliation cases separately. And if you look at their cases, the cases that they've cited in their brief, they don't reference any First Amendment employer retaliation cases. In fact, the case he just cited, Riley, was not such a case. The courts treat it differently because there's a distinction when you are taking away a benefit that someone has because of their speech. That is an overreach by the government. That's the government essentially making a very pure First Amendment violation. So in the context of First Amendment employer retaliation, there is — there are protections that are different than potentially in the Riley case. Does it — does it make a difference here that there was more due process before she ultimately, you know, got reprimanded or got an adverse reaction, that it was a — it wasn't just the head — it wasn't him himself, it wasn't the head of the office, it was a neutral arbitrator who made that decision? I assume — I think that's what they're getting at. It wasn't clear from the briefs, but I think that's the gist of it. So, no, it doesn't matter, because the — what the court, the Ninth Circuit, looks at following Casalter, which was a 2003 case, what they look at is whether the retaliatory conduct is reasonably likely to deter future First Amendment activities. So simply initiating a procedure that can result in the determination, if that's all Mr. Whitlock did was, I'm going to initiate this procedure, I'm going to serve you with disciplinary paperwork that's going to initiate an investigation into whether you have the correct credentials, that act alone is reasonably likely to deter future First Amendment activities. So, counsel, but — so that's what the counsel, Mr. Morrison, is trying to limit it to just that act, but it wasn't just the initiation of the procedure that constituted the allegedly retaliatory acts in this case. There was far more other things that Mr. Whitlock did. Like, he issued — he tried to fire her twice. Even after this due process hearing, he suspended her for, quote-unquote, misrepresenting her physical condition and abusive leave privileges, and he did other acts of harassment, trying to get rid of her. And we didn't hear a mention of those acts by Whitlock's counsel. And it — this is an ongoing series of harassment that the district court reasoned from in determining that there was not, I guess, qualified immunity for this — these acts. He banned her from substituting for full-time professors at one point, and failed to provide workplace disability accommodations, required her to take a leave of absence after experiencing physical health issues. I mean, it goes on and on. It's not just that he — I mean, found discrepancy in her file, right? That is correct. But why aren't we discussing that? That's part of this whole fabric of retaliatory behavior here. It is. And the — if we go back to Consulter, the question is whether — well, if we go back to qualified immunity, setting aside a — they have essentially — well, they don't have essentially. They have conceded the prong of the qualified immunity analysis that discusses whether there is a constitutional violation. So we can move forward, based on their concessions, that Ms. Grigorescu engaged in protected speech. They've said right up here that she — that Mr. Whitlock initiated this disciplinary proceeding, and that they've conceded in their papers that there was a causal relation, that there's a tribal issue fact of whether or not her protected speech was a substantial motivating factor. So that's the first prong. There's a tribal issue fact on that. The second prong just looks at whether the right — the right that Ms. Grigorescu had, whether that was clearly established. And the thrust of their argument is that the way in which she chose to — to violate that right, the way in which she chose to retaliate against her, was not clearly established. But to Your Honor's point, Consulter case establishes that the reasonably likely to deter test can involve all — a whole host of issues, a whole host of even minor retaliatory contexts, which are exactly what occurred in this case. Everything that Your Honor represented were each individually and collectively could be considered adverse actions. And he — and Mr. Whitlock was on notice that these things could be considered adverse action based on the case law in Consulter. Mr. Bonner, if — if Mr. Whitlock had a grudge against Ms. — Ms. Grigorescu and wanted to fire her because of her green activities, and that was a substantial factor in him taking any action, but he didn't take any action until she applied for her certification. And then he noticed that there was a discrepancy. Who determines whether the hearing was because of his earlier anti-green motivation or because of the fact that he noticed a discrepancy? The jury. The jury makes that determination. So therefore, there should be no qualified immunity. There is no qualified immunity as a matter of right in the interlocutory appeal because that exact point you raised is a factual determination that needs to be left up to the jury. That — As long as the improper motivation is, under Consulter, a substantial or motivating factor for the adverse employment action, even though there was another cause for the adverse employment action, then he doesn't get a qualified immunity. He does not. It's a mixed-motive case. He does not get qualified immunity, and it's not a proper interlocutory appeal because it's a factual question that should be left up to the jury. But you're going to have to prove that.  And he's going to respond, well, I — you know, I found this discrepancy, and then it's going to have to be left up to the jury to decide who's telling the truth. I agree, Your Honor. That's why it's not proper for this. But you're arguing, too, that we don't have jurisdiction because it's a factual question, not a legal question? Yes. All we've been discussing today are these facts. His point, when he stood up — That's true, but there — there is a legal question as to whether there's a clearly established right here. As to the clearly established right, I would direct the Court to Dodge v. Evergreen Schools. The Dodge court in that case, the constitutionally protected speech at issue was the teacher wearing a MAGA hat to a school function. The principal says, if you wear that MAGA hat again, we're going to be in my office and we're going to be discussing it, and you're going to need to bring a union representative. In — with the Ninth Circuit looking at that case, addressing this exact same question of whether that teacher had a clearly established right to wear a MAGA hat, the court started its analysis with Pickering. And looking at Pickering, the court determined that public school teachers, going back to Pickering, have had a constitutional right to engage in controversial or speech that was not consistent with their public school employer, and that was protected. The court didn't look at any other type of more granular definition. There was no case they looked at to see whether someone had to — was wearing some type of campaign shirt. They just looked at whether or not wearing a MAGA hat was protected, and they started the analysis with — with Pickering. If I can build on Judge Baez's hypothetical. Assume there's a tenured professor at a state university, and he signs a, you know, whatever you want, pro- or anti-Gaza activity petition, and it's very active. And a college administrator doesn't like that position, whatever it is. At the same time, someone tells the college administrator, hey, look at these sheets, funding sheets for our department. I think this professor has been embezzling funds for personal use. So the administrator then refers that to the local police, investigated, and in the court system the professor is found guilty, and part of the contract, employment contract, says if you're convicted of a felony, you lose tenure, you can be fired. So in that situation with that college administrator, maybe mixed motives, maybe didn't like the professor for his views, but also was genuinely concerned about embezzlement and was given that information and felt that he had to act, that person wouldn't get qualified immunity? Likely — well, obviously it would depend, but likely they wouldn't get qualified immunity if there were sufficient facts to show a causal connection between their conduct initiating this criminal activity — criminal investigation and the protected speech. In this case, they've conceded that there is that causal connection. So if the — in your hypothetical, Your Honor, if the teacher could not show any causal connection between the initiation of the criminal proceeding and his protected which would be a constitutional violation. However, under Casalter, if he — if he initiated criminal investigations, that could — and that stopped this teacher that was reasonably likely to deter future First Amendment conduct, that would — it would be clearly established that if that was why he did it, that would be a constitutional violation. And the question would be whether there would be facts to show a constitutional violation. If there were, he would not be entitled, as a matter of law, to qualified immunity. He'd have to prove before a jury that that was his true motivation. It seems like it gives incentives to state employees to be very loud and vocal about, you know, any political hot-button issue, kind of gives you extra protection. If you're loud enough and people notice, you can always say there's a factual issue and that's the reason I've been — I'm being — I'm getting disciplined. Yes. Yes, Your Honor. Public employees are protected by the Constitution, but they still have to show causation. Causation is not an easy — is a — is a substantial hurdle for these types of cases. But we're not here talking about causation because that's been — that's been conceded. We're here talking about whether it was clearly established that public school employees have the right to speak on matters of public concern and free from retaliatory conduct. And for that matter, just as in Dodge v. Evergreen School, the Ninth Circuit started its analysis with Pickering and determined that in some cases, it's so clear from decisional law that you don't have to have an exact case on point. There's no person working with public school employees who wouldn't think that school teacher has the right to wear a MAGA hat, has the right to engage in sit-ins, has the right to join a lawsuit to fight the use of public funds in education. So for those reasons, I think Your Honors should affirm the district court's denial of summary judgment on the basis of qualified immunity. Thank you. All right. Thank you very much. Gaga Rescue v. Whitlock is submitted, and this session of the court is adjourned for today.
judges: WARDLAW, BEA, LEE